612 So.2d 1131 (1992)
FIRST UNITED BANK OF POPLARVILLE and First United Bank of Bay Springs
v.
James Earl REID, Patricia Stines and James Kenneth Ray Reid.
No. 90-CA-297.
Supreme Court of Mississippi.
December 31, 1992.
*1132 M.D. Tate, II, Smith, Smith, Tate & Cruthird, Picayune, David R. Smith, Smith, Smith, Tate & Cruthird, Poplarville, for appellants.
Charles H. Reid, Hattiesburg, for appellees.
Before ROY NOBLE LEE, C.J., and PRATHER and BANKS, JJ.
BANKS, Justice, for the Court:
Here, we are confronted with the unfortunate circumstance of a borrower, who falls ill during the term of a credit life policy, but who dies after its expiration. The borrower's family seeks to charge the bank with responsibility for the failure of coverage under a variety of theories.[1] Concluding that none of the proffered theories have merit under the circumstances, we reverse and render.

I
Defendants, First United Bank of Poplarville, and First United Bank of Bay Springs [hereinafter First United or bank], appeal from a final judgment entered on April 13, 1989, by the Circuit Court of Pearl River County, Mississippi, pursuant to a jury verdict awarding the plaintiffs, James Earl Reid, James Kenneth Ray Reid, and Patricia Stines [hereinafter Reids] actual damages in the amount of $23,000.
*1133 On October 8, 1987, the Reids filed suit against First United and Cherokee National Life Insurance Company [hereinafter Cherokee] seeking to recover from the defendants, jointly and severally, $23,000, together with prejudgment interest, allegedly due on a policy of credit life insurance solicited from the Reids by First United as an authorized agent for Cherokee. First United and Cherokee answered, denying the Reids' allegations and asserting certain affirmative matters. On March 21, 1988, the trial court entered an order dismissing the complaint against Cherokee pursuant to Rule 4(h), Miss.R.Civ.P. (1982), for failure to effect service of process upon Cherokee within 120 days after the filing of the complaint.
The Reids alleged in their complaint that prior to the untimely death of Betty Rae Reid from natural causes on October 8, 1981, her husband, James Earl Reid, and her daughter, Patricia Stines, attempted to pay the premium on a policy of credit life insurance, thereby extending coverage on Betty Reid, who, at the time of this tender, was lying in a coma following a brain hemorrhage. The Reids alleged that representatives of First United would not permit them to extend the coverage and, following Betty Reid's death, they were entitled to judgment against the defendants in the face amount of the credit life policy.
When the last certificate of insurance was issued by First United on March 26, 1981, Betty Rae Reid was in sound health. The onset of her fatal illness came about on September 2, 1981, while the certificate was still in force. Betty Reid died on October 8, 1981, twelve (12) days after coverage expired on September 26, 1981. Cherokee denied the Reids' claim for benefits on November 24, 1981.
Trial of this cause was held on April 4, 1989. A jury of twelve returned a verdict for the Reids and awarded them $23,000, the face amount of the policy. Motions for a directed verdict, a request for peremptory instruction, and First United's post-trial motion for JNOV or, in the alternative, for a new trial were all denied.
First United appeals contending that the Reids failed to introduce any substantial evidence that they were entitled to recover on the basis of the certificate of insurance issued by the bank or, if not on this basis, then by virtue of an agency relationship existing between First United and the Reids with respect to the procurement of credit life insurance. Specifically, First United raises on appeal:
(1) denial of their motion for a directed verdict at the close of the plaintiffs' case;
(2) the granting of jury instruction C-2, which permitted the jury to find for the plaintiffs, if the jury concluded that the bank undertook to secure insurance, that diligent pursuit of such undertaking included disclosure of the requirement of good health at the time of any reissue, that the bank failed to so disclose and that such failure caused the plaintiffs to forego alternative insurance;
(3) the denial of two defense instructions, one explicitly and the other in effect, peremptory; and
(4) the purported abuse of judicial discretion in accepting an insurance agent as an expert witness for the Reids to express and opinion whether the bank was required to make certain disclosures to the Reids.

II
First United Bank of Poplarville, formerly First Citizens Bank & Trust Company, has been in the banking business since 1978. It performs services such as lending money to qualified debtors like James Earl and Betty Rae Reid, who, as husband and wife, were owners of a small grocery in Poplarville known as Reids' Mini-Mart.
Cherokee National Life Insurance Company of Macon, Georgia, is in the business of credit life insurance.
In 1979, First United entered into a "Creditor Agency Agreement" [hereinafter Agreement] with Cherokee whereby the bank became an agent of Cherokee authorized to "solicit insurance on behalf of [Cherokee] and to deliver policies/and or group certificates prepared by [Cherokee] ... to debtors of [First United] who appear *1134 to the Agent [First United] to be in sound health, upon receipt from such debtors of the premium stipulated... ."
The certificates of insurance were issued by First United under Cherokee's Master Group Credit Insurance Policy No. 3484 which contained on its second page provisions stating that "[e]ach debtor of the Creditor, who is in sound health, in the following classes of indebtedness shall be eligible for insurance hereunder" [paragraph 4.] and "[a]ny renewal or refinancing of any loan shall be treated as a new loan [paragraph 9.]." [emphasis supplied] The original copy of the Master Policy was forwarded to First United and placed in its file.
Under the Master Policy, First United, as an authorized agent for Cherokee, could issue level term credit life insurance, decreasing payment credit insurance, or disability credit insurance. In order to issue a credit insurance certificate under the Master Policy, the insured had to be a debtor of the bank, to appear to the bank to be in sound health, to meet certain age requirements, and to pay the required premiums. The duration of the certificate of insurance was the duration of the loan it insured.
During the year 1981, both the Agreement and Master Policy were in full force and effect. Neither instrument authorized First United to extend or renew credit life insurance certificates; rather, when a loan that had reached maturation was renewed, it was necessary to apply for a new certificate of insurance. Each credit insurance certificate issued to an insured contained the following language under "Conditions of Coverage":
Discharge of Indebtedness Prior to Maturity: If the indebtedness is discharged due to prepayment, the insurance in force shall be terminated. If the indebtedness is discharged due to renewal or refinancing prior to the scheduled maturity date, the insurance in force shall be terminated before any new insurance may be issued in connection with the renewed or, refinanced indebtedness. [emphasis supplied]
The Reids had a loan account with First United Bank. In 1979 they had borrowed money from the bank to purchase Reid's Mini-Mart. From time to time thereafter, during the course of operating their business, the Reids would renew or refinance their loan. While the original loan was in the form of an annual note, each succeeding loan had been in the form of a six-month demand promissory note signed by Reid and his wife and secured by a deed of trust. As each note neared maturation, the Reids would renegotiate a new loan for an additional six months. On the occasion of each new loan, the Reids requested and were issued by First United a new certificate of level term credit life insurance. James Reid testified both he and Betty wanted this insurance in case something happened to either one of them, but the general tenor of his testimony was to the effect that he understood the bank required the coverage.
To this end, on April 30, 1980, James Earl Reid, who was illiterate, and Betty Rae Reid, who was not, signed a six-month demand promissory note in the sum of $22,199.83 which reflected a maturity date of October 27, 1980. The Reids requested, paid for, and were issued a certificate of level term credit life insurance which became effective the date of the loan.
On October 23, 1980, James and Betty Reid renewed their maturing loan by signing a six-month demand promissory note in the amount of $23,460.00 which had a maturity date of April 21, 1981. Once again, the Reids requested, paid for, and were issued a new certificate of level term credit life insurance for the duration of the loan.
Finally, on March 27, 1981, as the maturity date on the October note approached, James and Betty Reid, who were usually accompanied by their daughter, Patricia Stines, went to the bank where they renewed their loan a final time by signing a six-month demand promissory note in the amount of $23,890.54. This six-month note had a maturity date of September 26, 1981.
Certain fine, but not inconspicuous, print located immediately above the signatures of the Reids read as follows: "CREDIT *1135 LIFE Insurance and CREDIT ACCIDENT & HEALTH Insurance are voluntary and not required for credit. If the Borrower obtains this insurance through the Lender, the costs ... for the term of the Credit are: $460.00." [emphasis supplied] Once again, the Reids requested and paid for credit life insurance in the face amount of the renewed loan. Betty Reid was issued certificate number 079512 reflecting single life level term coverage in the amount of $23,000 for a term of six months, all as reflected on the face of the certificate issued and given to the Reids. The certificate stated, inter alia, "[t]hat no coverage shall exist ... which is not expressly granted in the Master Policy issued to the Creditor." There is no indication that the Reids elected to take accident and health insurance and no issue is presented in that regard.
On August 25, 1981, Betty Reid was hospitalized after complaining bitterly of headaches. On September 2, 1981, while an inpatient at Forrest General Hospital, Mrs. Reid suffered a brain hemorrhage and slipped into a coma from which she never awakened. She remained hospitalized in a comatose condition until her death on October 8, 1981. The bank became aware of Betty Reid's fragile condition within a week of her illness.
In the meantime, between September 10 and 15, 1981, James Reid and his daughter, Patricia Stines, went to First United to renegotiate their loan and renew the credit life insurance, after receiving notice of the pending maturity on September 23 of the last promissory note executed on March 27, 1981. After showing the statement she had received in the mail to Rheba Stokely, a teller, and upon informing Stokely that Stines "needed to take care of that", Stokely referred Reid and his daughter to Jimmy Henry, the Reids' loan officer.
Stines, the recordkeeper for Reids' Mini-Mart, testified that Henry informed both her and her father the loan could not be renegotiated or renewed because her mother had to personally renew and sign the note in her own behalf. This could not be accomplished, of course, because Betty Reid was hospitalized in a comatose condition and was unable to request any services from First United Bank. The Reids, who were ready, willing, and able to pay a six-month premium, attempted to purchase at this hour credit life insurance, which the bank declined to sell them because there was no renewed or refinanced loan upon which to issue a policy of insurance and because Mrs. Reid was not in sound health, as required by the Agreement and Master Policy.
Betty Reid died on October 8, 1981. Following her death, First United, at the request of the Reids, submitted a claim to Cherokee on certificate number 079512. On November 24, 1981, Cherokee denied the claim because "coverage expired 9-26-81." Mr. Reid paid off the debt to First United Bank. The Reids subsequently filed suit against Cherokee and First United on October 8, 1987.

III

A.
At the close of all the evidence, the trial judge overruled First United's renewed motion for a directed verdict, stating he was going to "... let the case be submitted at this point to the jury and see what they do with it." In his order overruling First United's motion for J.N.O.V. or, in the alternative, for a new trial, the circuit judge wrote that he was prepared to enter a directed verdict for the defendant bank but that at the request of the Reids' attorney the court allowed counsel the opportunity to obtain a copy of the law upon which counsel was basing his claim.
Any error by the trial court in denying First United's motion for directed verdict made at the close of the Reids' case-in-chief was waived when First United introduced evidence in its own behalf. Engineering Service Co., Inc. v. Minor, 346 So.2d 916 (Miss. 1977); Patrick v. Michigan Nat. Bank, 220 So.2d 273 (Miss. 1969); Broadhead v. Gatlin, 243 Miss. 386, 137 So.2d 909 (1962).
The motion in a jury trial for a directed verdict made at the close of the *1136 plaintiff's case, as well as the request for a peremptory instruction at the end of all of the evidence or a motion for judgment notwithstanding the verdict thereafter, are procedural vehicles for challenging the sufficiency of the plaintiff's case. Each requires that the lower court consider all of the evidence before it at the time the challenge is made or the motion is offered. Clements v. Young, 481 So.2d 263, 268 (Miss. 1985).
The sufficiency of the evidence presented by the Reids as to the bank's liability must be considered on the basis of all the evidence offered and the lower court's ruling tested under its denial of First United's motion for judgment notwithstanding the verdict.
Our familiar and well-settled scope of review is stated in Weems v. American Security Insurance Company, 450 So.2d 431, 435 (Miss. 1984), as follows:
The request for a peremptory instruction or the subsequent motion for a judgment notwithstanding the verdict tests the legal sufficiency of the evidence supporting the verdict. Either asks the court to hold, as a matter of law, that the evidence is insufficient to support a verdict in favor of the non-movant. Where such a request has been made, the trial court must consider all of the evidence  not just the evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. See, e.g., General Tire and Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss. 1969); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983).
See also Litton Systems, Inc. v. Enochs, 449 So.2d 1213, 1214-15 (Miss. 1984).

B.
The Reids argue that recovery is proper under either of two theories.
They contend there was substantial credible evidence to support a verdict in their favor on their complaint to recover under the certificate of insurance. We reject this contention. There was no evidence presented to show that First United, as an authorized agent for Cherokee, was liable to the Reids on the certificate of insurance which all parties agree terminated by its terms on September 26, 1981, approximately twelve days before Betty Reid's regrettable demise. Simply put, it is undisputed the certificate was not in force and effect at the time of Betty Reid's death on October 8, 1981. Moreover, no instruction was given which would have allowed the jury to find for the plaintiffs on such a theory.
The Reids argue that they were entitled to coverage beyond September 26, by virtue of the fact that they paid for a six-month period extending to April 23, and when they renewed the loan on March 27 they obtained a new policy extending to the September date. They received no refund for the period between March 27 and April 23. The master policy provided that under such circumstances a refund would be given, if requested, and that if there was no request, the policy would remain in effect. Under the terms of the master policy then, the Reids were double insured for the period March 27 to April 23. The argument that the circumstances should be construed to extend coverage for 26 days beyond September 23, while intriguing, is one of contract properly made with reference to Cherokee only, the disclosed principal issuing the contract of insurance. As Cherokee is not before us, this argument affords the Reids nothing.
Next, the Reids contend there is substantial probative evidence in the record that First United became the insurance *1137 agent of James Earl Reid and Betty Rae Reid for the procurement of credit life insurance and that it breached its duty to the Reids, when it failed to provide them with proper and pertinent information concerning the renewability and the conditions of renewability of their insurance. They assert correctly that an agent for the insured, has a duty to use that degree of diligence and care with regard to securing insurance which a reasonably prudent person would exercise in the transaction of that person's own business of a like nature. McKinnon v. Batte, 485 So.2d 295, 297 (Miss. 1986); Security Insurance Agency, Inc. v. Cox 299 So.2d 192, 194 (Miss. 1974)
Generally, the Reids contend they were uninformed about the scope of their coverage, nonrenewal provisions, and the requirement that they be in sound health. Specifically, they argue that considering the history of the loan, the bank's superior bargaining position and James Reid's illiteracy, First United breached its duty as a fiduciary when it failed to inform them the policy would not be reissued if either James or Betty were not in "sound health", failed to furnish them with a copy of the Master Policy or to even tell them about its existence, and compelled them to take out credit life insurance with the bank as opposed to offering them the option of placing coverage with some other source.
First United, on the other hand, claims the Reids failed to establish the bank was the Reid's agent for the purpose of procuring credit life insurance in September of 1981. The bank contends there is neither proof of an agency relationship in the record nor any allegation of agency in the complaint upon which liability may be predicated. According to the bank, it breached no duty owed to the Reids.
"The burden of proving an agency relationship rests upon the party asserting it, in this case [the Reids]." Highlands Insurance Company v. McLaughlin, 387 So.2d 118, 120 (Miss. 1980). Accordingly, the burden was on the Reids to prove that First United Bank was their agent for the purpose of securing credit life insurance. If we restrict our view to September 1981 as the bank's argument appears to suggest, there was clearly no such agency established. It is undisputed, however, that the Reids were offered and accepted credit life insurance with respect to their loan and each extension thereof. Under the circumstances, the bank indeed became their agent for the procurement of such insurance. Hancock Bank v. Travis, 580 So.2d 727, 731-732 (Miss. 1991) As such the bank was charged with a duty of good faith and reasonable care. McKinnon, 485 So.2d at 297. This Court stated the applicable standard in Ritchie v. Smith, 311 So.2d 642 (Miss. 1975):
An insurance agent owes the duty to his principal to exercise good faith and reasonable diligence to procure insurance on the best terms he can obtain, and any negligence or other breach of duty on his part which defeats the insurance he procures will render him liable for the resulting loss. In this regard, the agent must faithfully carry out the instructions given him by his principal, his duty being not merely to obtain a policy, but to obtain one which conforms to the application. Moreover, by holding himself out as being qualified to procure insurance, the agent is required to exercise the particular skill reasonably to be expected of one in that occupation, and to have adequate knowledge as to the different companies and the variety of terms available with respect to the undertaking he has assumed.
311 So.2d at 646.
The relationship between a lender acting as a credit life insurance agent and the customer/insured was explored in Browder v. Hanley Dawson Cadillac, 62 Ill. App.3d 623, 20 Ill.Dec. 138, 143, 379 N.E.2d 1206, 1211 (1978). While holding that the question whether the lender is the agent of the customer for these purposes is a question of fact to be left for determination on remand by the lower court, that court opined that, if an agent, the lender owed a duty
of utmost good faith and must make known to his principal all material facts within his knowledge which may in any *1138 way affect the transaction and the subject matter of his agency.
Id. See, also, Spears v. Colonial Bank of Alabama, 514 So.2d 814, 819 (Ala. 1987) (Jones, Justice, concurring specially). Hlavaty v. Kribs Ford, Inc. 622 S.W.2d 328 (Mo. App. 1981).
In Lowery v. Guaranty Bank and Trust Co., 592 So.2d 79 (Miss. 1991), we treated the issue whether a particular fact pattern, quite similar to that of the instant case, created a fiduciary relationship between lender/insurance agent and borrower/insured. Reviewing a grant of summary judgment, we found that an issue of a fact was presented as to whether such relationship was created and reversed and remanded for trial. 592 So.2d at 85. The clear import of our decision there is that one offering credit life insurance should be held to the same standards as those dealing in other types of insurance. We see little reason to differentiate between credit life and other insurance products. We hold that those who would offer to procure this type insurance and enjoy commissions for their service owe as much candor and good faith as any other insurance agent.
The question, then, is whether the bank fulfilled its assumed obligation. More specifically, was the bank obligated to secure for its customer the right to extend that coverage for as long as the debt remained unpaid or to inform its customer that it would not do so.
The Reids complain that no one told them that the policy obtained would not be renewed upon expiration should one of them fall into poor health. That they were not specifically told this fact is undisputed. Under our standard of review we accept as true the contention that they were not subjectively aware that the insurance was for a six-month term and that insurance would not be reissued for one in poor health.
We note, however, that the certificate of insurance showed on its face that it was for a period of six months. The loan in question was for a like period. Mrs. Reid's illness was unexpected. There is no suggestion in this record that the Reids were concerned about renewability. The Reids never sought to review the master policy despite the fact that reference to that policy was made on the face of the certificate. We also note that the same situation would obtain had the Reids simply gone into default at the end of the six-month period and suffered accidental or other sudden death after the policy expired. Unlike the situation presented in Lowery, plaintiffs were clearly aware of the termination date of the insurance. Id. at 80-81.
Through its approval of instruction C-2, the only substantive instruction guiding the jury as to liability, the court allowed the jury to find that reasonable prudence on the part of an agent so engaged included advice as to the Reids that the policy would not be renewed under the circumstances which occurred here. The arguable basis for such an instruction is the testimony of, R. Lee "Chip" Edmonson, a general insurance agent, to the effect that in his opinion an insurance agent should have made disclosure concerning renewability to the Reids.
Edmonson, while admitting that he knew little about credit life insurance and the practices in that industry, gave as his credentials that he is a chartered life underwriter familiar with the "practices and obligations" of persons writing life insurance. He expressed the opinion that an agent should fully explain the provisions of the policy including the fact that upon expiration the customer has no automatic right to renew.
The bank objected to the use of Edmonson as an expert on the ground that he had no experience in the field of credit life insurance. The court overruled the general objection and the specific objections made to questions seeking to elicit the opinion regarding an agent's obligation. Again, we find no reason to differentiate between the general duty of candor owed an ordinary life insurance agent and that owed by one selling credit life.
The more difficult problem with instruction C-2 is that it also allowed the jury to conclude that, upon disclosure of possible non-renewability, the Reids would have secured *1139 other insurance. A review of the record fails to reveal any evidence whatever that the Reids would have obtained other insurance or declined the policy proffered. Nor is there evidence that the Reids failed to obtain other coverage due to any representations or failure to disclose. The clear tenor of Mr. Reid's testimony was that it was his understanding that insurance was required to get the loan and initiated by the bank, not the Reids. There was no indication of an independant desire to obtain coverage different than that secured by the bank.
Perhaps this is so because the theory of recovery here advanced is nowhere to be found in the complaint filed by the Reids. Their complaint advanced two theories, one, that Cherokee was indebted to them under the contract of insurance and, two, that the bank (presumably, it is not so alleged, wrongfully) denied them the opportunity to renew the policy. The complaint suggested no theory under which the bank assumed a duty to effect renewal or reissuance of the policy. Nor did it suggest a cause of action for failure to disclose.
We agree with First United, then, that the instruction lacked evidentiary support. There is no substantial credible evidence in the record to support a finding by the jury that, if the Reids had been properly advised, "the plaintiffs would not have taken out the insurance policy in question but would have secured other life insurance elsewhere."
"[B]efore the jury is instructed regarding a disputed fact, there must be some credible evidence in the record which would support the instruction." Purina Mills, Inc. v. Moak, 575 So.2d 993, 996 (Miss. 1990). Instructions lacking evidentiary support should not be given. Detroit Marine Engineering v. McRee, 510 So.2d 462 (Miss. 1987); Johnson v. Foster, 202 So.2d 520 (Miss. 1967).
Without evidence that non-disclosure affected the actions of the Reids, there can be no injury, and, thus, no cause of action on that ground.

CONCLUSION
First United was entitled to judgment notwithstanding the verdict because there is insufficient evidence in the record to establish directly or by reasonable inference that it failed to fulfill any duty assumed by it on behalf of the Reids with respect to the procurement of credit life insurance resulting in injury. The judgment of the circuit court is therefore reversed and rendered.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN and ROBERTS, JJ., concur.
McRAE, J., concurs in result only with separate written opinion joined by DAN M. LEE, P.J.
McRAE, Justice, specially concurring:
I agree that the appellant, First United Bank of Poplarville, should be dismissed from this law suit and judgment rendered; however, I disagree with the reasoning used by the majority to reach that decision. The contract at issue was with Cherokee National Life Insurance Company, which was not a party to the lawsuit. The statute of limitations had run against Cherokee National and as noted by the majority, process had not been issued against it. Had Cherokee been a party, coverage would have been afforded pursuant to our decision in Brown v. Blue Cross & Blue Shield of Mississippi, Inc., 427 So.2d 139 (Miss. 1983).
In Brown, the claimant was insured under his employer's Blue Cross & Blue Shield policy. He and his wife waited the required time to allow maternity benefits to be covered and conceived a child. During the term of her pregnancy, the employer dropped maternity benefits. When the child was born, Blue Cross denied coverage, claiming no maternity benefits existed. This Court held, in essence, that the benefits had vested at the time the child was conceived because Mr. and Mrs. Brown had reasonable expectation of coverage. The Brown Court noted with approval the observation of one commentator that:

*1140 The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.
427 So.2d at 141, fn. 2. quoting Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 967 (1970).
Likewise, in Pitts v. American Security Life Insurance Co., 931 F.2d 351 (5th Cir.1991), the Federal Court found that although a policy was voidable, a claimant's benefits under the policy were vested since it had been in full force at the time he was injured. Id. at 358. Pitts, the claimant, sustained brain damage as the result of an accident. After the insurance company terminated his employer's insurance plan, Pitts' father continued to pay the premium to keep the policy in effect. When American Security had paid medical benefits in excess of $100,000.00, the company sought to increase the premiums in a conscious effort to force cancellation of the policy. The Fifth Circuit, affirming the lower court's finding that Pitts' benefits and rights were vested, did not require him to pay any additional premiums. This is in line with the theory that the insurance does not vest, but rather the benefits do upon the happening of the insured event, whether or not additional insurance premiums are paid. We must be careful to distinguish between insurance and benefits. The idea is that if an individual has a heart attack, develops cancer, breaks his leg, or suffers any other injury or ailment not related to the injury which occurred while he had insurance coverage, and that policy is no longer in effect, he has no insurance and can receive no benefits under that policy for those subsequent events. However, because he had purchased insurance and the insured event occurred while his coverage was in full effect, the benefits for that single illness or injury remain vested until the time the insured gets well, dies, or the benefits are exhausted.
In the case sub judice, the insured became terminally ill and lapsed into a coma with no hope of recovery only a few days prior to the expiration of her policy. Although she died approximately eight days after the alleged expiration date of the policy, the benefits vested in this case when she fell ill, and I would so hold. Each case, of course, rests on its own merits and conditions. However, because the illness which lead to the coma and ultimately, her death, began while the policy was still in effect, the benefits vested. The insurance contract was with Cherokee who is not a party. The bank is not a party to the contract and should be dismissed. Therefore, I concur in the results only.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] The credit life carrier is not before us due to a failure of timely service and the expiration of the period of limitations.