# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CA-00614-SCT

*FIRST INVESTORS CORPORATION, ADMINISTRATIVE DATA MANAGEMENT CORPORATION AND FIRST INVESTORS INSURED TAX EXEMPT FUND, INC.*

*v.*

*JAMES W. RAYNER, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/04/95 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM F. RAY |
| | GRADY F. TOLLISON, III |
| ATTORNEY FOR APPELLEE: | JOHN H. DUNBAR |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 5/6/1999 |
| MOTION FOR REHEARING FILED: | 5/18/99 |
| MANDATE ISSUED:July 29, 1999 | |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. In this case, we are confronted with allegations of conversion and Mississippi securities law violations, for which judgment was entered for the investor. We conclude that the investor was not estopped from bringing a claim and that the trial court properly allowed the jury to consider conversion. The trial court did not erroneously deny appellants of the right to allocate liability pursuant to Miss. Code Ann. § 85-5-7 (1991). Accordingly, we affirm the judgment of the trial court as to liability. We conclude, however, that there was error in instructing the jury with regard to damages. Therefore, we reverse as to damages and remand this case to the trial court for a new trial and damages only.

**I.**

¶2. This is a lawsuit filed by Dr. James W. Rayner against First Investors Insured Tax Exempt Fund, Inc. (hereinafter "the Fund"), a mutual fund; First Investors Corporation, a broker-dealer which serves as the Fund's principal underwriter; and Administrative Data Management Corporation, the Fund's transfer agent. The Fund was found liable for money stolen from Rayner by his broker, Bernie Smith.

¶3. The jury returned a verdict in favor of Rayner for $125,574.38, which was one-half of the value of the converted securities through January 31, 1995. Rayner was found to have been fifty percent (50%) negligent. Judgment was entered accordingly. The Fund appeals and Rayner cross-appeals. The following issues are raised:

## DIRECT APPEAL

**I. WHETHER THE TRIAL COURT ERRED IN FAILING TO DISMISS THE CASE AS A MATTER OF LAW, BASED ON ESTOPPEL.**

**II. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON CONVERSION.**

**III. WHETHER THE TRIAL COURT FAILED TO PROPERLY INSTRUCT THE JURY AS TO DAMAGES.**

**IV. WHETHER THE TRIAL COURT DEPRIVED THE FUND OF THE RIGHT TO ALLOCATION OF LIABILITY AMONG THE VARIOUS PARTIES, PURSUANT TO MISS. CODE ANN. § 85-5-7.**

**V. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT RAYNER'S DAMAGES WERE TO BE DETERMINED BY THE VALUE OF THE SECURITIES AT THE TIME OF THE TRIAL.**

## CROSS-APPEAL

**I. WHETHER THE LOWER COURT ERRED IN NOT GRANTING SUMMARY JUDGMENT, PEREMPTORY INSTRUCTION, AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, BASED ON ARTICLE 8 OF THE UCC AND THE COMMON LAW OF CONVERSION.**

## II.

¶4. Rayner began investing back in the early 1970's, with investments in over 15 mutual funds. Rayner gave Smith substantial discretion over a portion of his portfolio as Smith was a respected banker and investment advisor in the Oxford community. As much as $700,000 was invested in C.D.'s with the aid of Smith. Smith was allowed to open a bank account, as the sole signatory, to receive the interest paid on Rayner's C.D.'s. at the Merchants & Farmers Bank. Rayner did not keep up with the activity in this bank account, and he stated that he did not know that it still existed as late as 1992.

¶5. In early 1986, Rayner wanted to invest in a mutual fund that invested primarily in municipal bonds. These securities were recommended to Rayner by Smith, who was then a registered representative of

Investment Management and Research. IM&R was an affiliate of the brokerage firm of Raymond James.

¶6. To invest in the mutual fund through Smith, Rayner signed a "new account form" with Raymond James. Rayner knew the purpose of the new account form was to open the mutual fund account. Rayner provided Smith's post office box as his address on the form given to Raymond James. Rayner explained at trial that he did not provide his own address, because he did not want to deal with paperwork associated with this investment. Rayner wanted Smith to receive the monthly statements and provide him with an annual summary of the performance of his investment. Rayner knew that Smith's address was being used as the account address. Because the Fund only had Smith's address, no correspondence about the investments ever went to Rayner's true address.

¶7. Rayner paid $100,000 initially in 1986 for 9,960.159 shares. He later paid $45,000 in 1987 for another 4,237.288 shares. By 1990, he had received additional shares through the periodic reinvestment of stock dividends.

¶8. There were two ways in which these shares could be redeemed. First, a shareholder could elect the right to redeem them by telephone, by completing a special form to authorize telephone redemptions. If this option was chosen, the Fund was explicit that the risk of loss from any fraudulent telephone redemption was borne by the investors:

> The Fund, FIC, and the Transfer Agent will not be responsible for the authenticity of redemption instructions received by telephone or any loss, damage, cost or expense arising out of any telephone instruction received for an account. Any financial losses arising as the result of a dispute about the interpretation or execution of a telephone redemption will be borne by the shareholder. . . .

¶9. Alternatively, an investor could redeem his shares in writing by mail. The Fund was authorized to redeem Rayner's securities if he requested redemption in writing, with the request signed by him, and his signature guaranteed.

¶10. Approximately four years after the first purchase, on March 21, 1990, Smith prepared and mailed to the Fund written instructions to sell $150,000 of the shares of stock registered in Rayner's name. Smith admitted that he forged Rayner's signature on a "liquidation request form" and sent it to the Fund. The form, which appeared to have been signed by Rayner, requested the distribution to be sent to him at the account address. The "liquidation request form" included a forged stock power of attorney, also apparently signed by Rayner, and a forged "signature guaranteed" stamp. The stamp was presumed to have been a signature guarantee stamp from Raymond James. However, it was made at a local stamp shop in Oxford.

¶11. As a result of receiving the written instructions requesting the liquidation of the securities, the Fund issued a check payable to Rayner in the amount of $150,000. The check was sent by certified mail to the address provided in the Raymond James account application. A confirmation was also sent to Rayner at the same address, describing the transaction. The Fund stated that it had no way of knowing that Rayner had supplied Smith's address as his own.

¶12. Upon receipt of Rayner's check, Smith forged Rayner's endorsement, and deposited the funds into Rayner's account at the Merchants & Farmers Bank, which paid the check despite the forgery, and without an endorsement at all by Smith. Then Smith withdrew the $150,000 pursuant to the authority vested in him by Rayner.

¶13. On September 28, 1990, Smith prepared and mailed to the Fund written instructions to redeem the remaining securities in the Fund. Smith again forged Rayner's signature on the instructions and used the "signature guaranteed" stamp. The Fund issued a check payable to Rayner in the amount of $37,713.96, and mailed the check to Rayner at the account address. As before, the Fund sent a confirmation letter, showing the account balance of zero, to Rayner at the same address. Smith forged Rayner's endorsement on that check to the First National Bank in Oxford, where he deposited the proceeds into an account he had opened. It goes without saying that Smith never returned any of these funds to Rayner.

¶14. Smith terminated his agreement with Raymond James in April of 1987. Therefore, at the time Smith made the written requests to the Fund in which he forged Rayner's signature, he was not a registered representative affiliated with Raymond James.

¶15. Rayner did not authorize Smith to redeem the securities discussed above. Further, because Rayner relied on the annual summaries provided by Smith, he did not know what Smith had done until January of 1993. It was at that time that Smith was charged with and confessed to mail fraud in federal court in Oxford.

¶16. The Fund had received information from Smith that he was no longer associated with Raymond James in 1987. After being called as an adverse witness at trial by Rayner, Christine DiFabio, representative of the Administrative Data Management on behalf of the Fund, stated that ADM did receive information to change the dealer on the account because Smith had changed companies. However, she stated that the "redemption area" of the Fund might not receive the information about the change in dealers until it was processed and possibly showed up in the account records.

¶17. The signature on the written request accompanied by the "signature guarantee" stamp was what the Fund required to follow the redemption instructions. Accepting the signatures and the signature guarantee as genuine, the Fund redeemed Rayner's shares as per the written redemption instructions by issuing the two checks to the account address.

¶18. Rayner did not want his securities sold. He had intended for those securities to be tax-free income and potential, long-term growth in the number and value of his shares. Rayner claimed that he never wanted, nor did he agree to accept, any checks from the Fund in exchange for his securities.

¶19. Smith intercepted the checks and used the proceeds for his own purposes. After he sent the written requests to the Fund, Smith continued to send forged, annual account statements to Rayner, which purportedly were the statements of the value of Rayner's securities in the Fund. This continued until Smith confessed in 1993. After which, Rayner requested the Fund to restore his securities. By letter dated February 12, 1993, Rayner through one of his attorneys, informed the Fund of Smith's forgery and unauthorized instructions and demanded that Rayner's securities be restored. The Fund refused to restore the securities, and this suit followed.

### III.

¶20. The Fund first argues that Rayner is equitably estopped from any recovery due to his own recklessness in allowing Smith to receive all of the account statements from the Fund. According to the Fund, Rayner should not be allowed to recover, because he failed to exercise the level of care a reasonable and prudent investor would have used under similar circumstances to protect himself from loss.

¶21. The doctrine of estoppel requires (1) belief and reliance on some representation, (2) change of position as a result thereof, and (3) detriment or prejudice caused by the change of position. ***Moore ex. rel. Benton County v. Renick,*** 626 So. 2d 148, 153 (Miss. 1993); ***Covington County v. Page,*** 456 So. 2d 739, 741 (Miss. 1984).

¶22. Equitable estoppel is a doctrine that is to be applied cautiously. It is to be used as a shield and not a sword. ***Id.*** "Equitable estoppel 'precludes a party from denying a material fact which he has previously induced another to rely upon, whereby the second party changed his position in such a way that he would suffer injury if denial was allowed.'" ***[Gulf Guar. Life Ins. Co. v. Duett](#)***, 671 So. 2d 1305, 1309 (Miss. 1996) (*quoting* ***Christian Methodist Episcopal Church v. S & S Const. Co.,*** 615 So. 2d 568, 571 (Miss.1993)).

> Where it would be substantially unfair to allow a party to deny what he has previously induced another party to believe and take action on, equitable estoppel may be enforced. Subjective intent to mislead is unnecessary, so long as the acts of the party sought to be estopped, viewed objectively, were calculated to and did mislead the other party.

***Christian Methodist Episcopal Church***, 615 So. 2d at 571 (citations omitted).

¶23. We have repeatedly held that "it matters not whether the party making the statement intended to deceive the other party at the time the statement was made; the test is whether it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action on." ***Id.***; ***PMZ Oil Co. v. Lucroy,*** 449 So. 2d 201, 207 (Miss. 1984).

¶24. In the present case, the representation supposedly relied upon by the Fund was the filing by Rayner of Smith's address on the new account form. The Fund, however, did not change its position as a result of this information. The only fact which might have supported the Fund's argument for dismissal on an estoppel theory was if the Fund had notified Rayner at the account address he provided *before* any action was taken on the account. There is no indication in the record that this was done. The confirmations appear to have been sent after the unauthorized action was taken. Thus, even if the Fund had known Rayner's address, this information would not have prevented the harm for which Rayner sued; the Fund's unauthorized re-registration of his shares based on Smith's forged instruction. As such, the Fund did not rely to its detriment on the information provided by Rayner. Any question regarding the extent to which Rayner could have softened the financial blow of Smith's fraud is an issue concerning mitigation of damages, not estoppel.

¶25. Thus, this Court holds that the Fund did not transfer Rayner's shares as a result of the address information he provided, and thus the Fund did not rely to its detriment on this information. This claim is without merit.

## IV.

¶26. The Fund asserts that the elements of conversion simply were not present, and no instruction should have been given. In reviewing jury instructions on appeal in ***Langston v. Kidder***, 670 So. 2d 1, 5 (Miss. 1995), we stated:

> "[W]ith any granted jury instruction challenged on appeal, two questions are necessarily implicated: Does the instruction contain a correct statement of the law? and, Is the instruction warranted by the evidence?" ***Hill v. Dunaway***, 487 So. 2d 807, 809 (Miss. 1986); *see also* ***Turner v. Temple***, 602

So. 2d 817, 823 (Miss.1992). A party is entitled to have the jury instructed regarding a genuine issue of material fact so long as there is credible evidence in the record which would support the instruction. *DeLaughter v. Lawrence County Hosp.*, 601 So. 2d 818, 824 (Miss.1992). . . .

670 So. 2d at 5. A jury instruction regarding a disputed fact should not be given unless there is credible evidence in the record which would support such an instruction. *First United Bank of Poplarville v. Reid*, 612 So. 2d 1131, 1139 (Miss. 1992).

¶27. "Conversion requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Terrell v. Tschirn*, 656 So. 2d 1150, 1153 (Miss. 1995); Accord *PACCAR Fin. Corp. v. Howard*, 615 So. 2d 583, 588-89 (Miss. 1993); *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987). The elements of conversion were enumerated in *Mississippi Motor Fin., Inc. v. Thomas*, 246 Miss. 14, 149 So. 2d 20 (1963), where we stated:

It is well settled that the acts alleged to constitute a conversion must be positive and tortious. 89 C.J.S. 534, *Trover and Conversion* § 4, p. 534. . . .

In *McJunkin v. Hancock*, 71 Okla. 257, 176 P. 740, the Court said: "To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand. *Sivils v. Aldridge*, [62 Okl. 89], 162 Pac. 198." *In Spooner v. Holmes*, 102 Mass. 503, 3 Am.Rep. 491, Mr. Justice Gray, speaking for the Court said: "Action of tort. . . cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself, or to deprive the rightful owner of it, or destroyed the property." In *Lee Tung v. Burkhart*, 59 Or. [194] 195, 116 P. 1066, the Court held that in order to maintain an action for conversion, there must have been, on the part of the defendant, some unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiff's rights, or else a withholding of the possession under a claim of right or title inconsistent with that of plaintiff. . . .

246 Miss. at 20-21, 149 So. 2d at 23; Accord *PACCAR Fin. Corp.*, 615 So. 2d at 588.

¶28. As to conversion, the Fund clearly and wrongfully sold Rayner's interest in the securities at issue, notwithstanding that it was induced to do so by the fraud of another. Thus there was an intent to exercise dominion in exclusion of the true owner's rights. *See PACCAR Fin. Corp.,* 615 So. 2d at 588-89; *Walker,* 501 So. 2d at 361; *Mississippi Motor Fin., Inc.,* 246 Miss. at 20, 149 So. 2d at 23. Although intent is required "it does not have to be the intent to be a wrongdoer." *Walker,* 501 So. 2d at 361. It makes no difference, therefore, that "the Fund was attempting to pay Rayner the value of his shares."

¶29. Thus, the trial court did not err in allowing the conversion instruction.

## V.

¶30. The fund contends that Rayner actually received the proceeds which were deposited into the bank account which Smith had set up in Rayner's corporate name.

¶31. "It is well settled that funds deposited to a general account belong to the bank, with the bank becoming the debtor to the owner of the account for the amount of the deposit." *Deposit Guar. Nat'l Bank v. B.N. Simrall & Son*, *Inc.,* 524 So. 2d 295, 299 (Miss. 1987).

¶32. The Fund directs our attention to the case of *Gotham-Vladmir Advertising, Inc. v. First Nat. City Bank*, 277 N.Y.S.2d 719, 723 (N.Y.App. Div. 1967), where a successor corporation that continued to use the bank account of its predecessor. The majority shareholder of the successor corporation brought claims against banks for payment on checks drawn on the account. The Supreme Court of New York, Appellate Division, noted that it is generally held "that a drawer is precluded from recovering from a drawee bank for paying his check on a forged or unauthorized endorsement where the proceeds of the check actually reach the person whom the drawer intended to receive them." *Id.* at 722.

¶33. The New York court's holding in *Gotham-Vladimir* was restated by the Fifth Circuit as "handling a check bearing an incomplete indorsement creates no liability so long as the proceeds reach the payee designated by the instrument." *Perini Corp.,v. First Nat. Bank*, 553 F.2d 398 412 (5th Cir. 1977).

¶34. In the present case, there was no evidence to support the Fund's contention that Rayner had control over the bank account. Rayner knew that the account existed, and he knew that Smith made transactions in the account with interest from certificates of deposit that Rayner owned. The Fund also elicited testimony from Grover Cleveland Kinney, III, president of the Oxford Branch of Merchants & Farmers Bank, to the effect that a person who sets up a trust account would have control over the addition and removal of signatories.

¶35. The Fund put forth no evidence, however, that it was Rayner who set up the account in question. Indeed, Smith testified that Rayner was probably not present when the account was established. His signature does not appear on the signature card or upon any corporate or other resolution authorizing the account. Moreover, the Fund put forth no evidence on the crucial issue of whether Rayner ever used the account himself. Thus, the trial court properly instructed the jury to find, as a matter of law, that Rayner had not actually received the funds by virtue of the deposit into this account.

## VI.

¶36. The Fund argues that the trial court erred procedurally treating separately Rayner's claim against it and not allowing the Fund to proceed simultaneously with its claims against others and in failing to allow joinder of Smith. Also, the Fund claims the trial court erred substantively by refusing instructions that would have allowed the jury to allocate fault among all the parties, including the defendants sued by Rayner and the non-defendant responsible persons.

¶37. Rayner originally sued, in addition to the The Fund related corporations, Raymond James & Associates (Raymond James), the brokeraged company where Smith had been employed, Eagle Asset Management, Inc, Merchants & Farmers Bank and the First National Bank of Oxford. The Fund moved under M.R.C.P. 19 to join Smith and First Pennsylvania Bank as necessary and indispensable parties, or in the alternative, for leave to file a third-party complaint against the banks. The trial court did not allow the joinder of the additional parties or the third-party complaint. It eventually allowed The Fund to file cross-claims against James and the banks but ordered a separate trial of the issues between Rayner and the Fund. Complicating matters was the fact that proceedings against Raymond James were stayed pursuant to an arbitration clause in the brokerage agreement. The Fund alleges all of these actions violated Miss. Code Ann. § 85-5-7 (1991) and was an abuse of the court's discretion under the rules of civil procedure.

¶38. Miss. Code Ann. § 85-5-7 (1991) reads in pertinent part as follows:

**Limitation of joint and several liability for damages caused by two or more persons; contribution between joint tort-feasors; determination of percentage of fault.**

(1) As used in this section "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including but not limited to negligence, malpractice, strict liability, absolute liability or failure to warn. "Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent.

(2) Except as may be otherwise provided in subsection (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be joint and several only to the extent necessary for the person suffering injury, death or loss to recover fifty percent (50%) of his recoverable damages.

(3) Except as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault. In assessing percentages of fault an employer and the employer's employee or a principal and the principal's agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or omission of the employee or agent.

(4) Any defendant held jointly liable under this section shall have a right of contribution against fellow joint tort-feasors. A defendant shall be held responsible for contribution to other joint tort-feasors only for the percentage of fault assessed to such defendant.

(5) Nothing in this section shall eliminate or diminish any defenses or immunities which currently exist, except as expressly noted herein.

(6) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert.

(7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.

(8) Nothing in this section shall be construed to create a cause of action. Nothing in this section shall be construed, in any way, to alter the immunity of any person.

¶39. M.R.C.P. 19 serves to balance the rights of all persons whose interests are involved in an action. That rule states in pertinent part:

(a) Persons to be joined if Feasible. A person who is subject to the jurisdiction of the court shall be joined as a party in the action if:

(1) in his absence complete relief cannot be accorded among those already parties, or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

M.R.C.P. 19(a); *Matter of Estate of McClerkin,* 651 So. 2d 1052, 1058 (Miss. 1995).

¶40. This Court has observed that "[i]t is, and should be, a paramount concern of the judiciary to prevent multiple suits where one suit will suffice." *Magee v. Griffin*, 345 So. 2d 1027, 1032 (Miss. 1977). M.R.C.P. 42 permits separate trials for the "furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy. . . ."

¶41. Here Smith is not an indispensable party to this suit under Rule 19. In this suit to determine the extent to which the Fund is liable to Rayner for re-registering his shares, complete relief can be accorded among the existing parties, without joining Smith.

¶42. The question of whether Smith engaged in fraud which induced the Fund to wrongly re-register the shares is a matter between the Fund and Smith, and is entirely separate from whether the Fund is liable to Rayner under Miss. Code Ann. § 75-8-311 or for conversion. In short, the Fund and Smith are not joint tortfeasors in Rayner's action. Rather, to the extent that the Fund is liable to Rayner, Smith is wholly liable to the Fund for its losses. This is especially evident in light of the fact that the allocation statute, § 85-5-7, would not include Smith's "specific wrongful intent" as a percentage of fault among joint tort-feasors.

¶43. As to the other original parties and First Pennsylvania Bank, the simple answer is that they are not joint tortfeasors. Regardless of the overbroad allegations against all defendants in his complaint, Rayner sued the Fund under § 75-8-311 and for conversion, alleging that the Fund as issuer, improperly re-registered his shares. None of the other parties could have shared responsibility for these cause of action, though the Fund may be able to maintain a cause of action against them for the proceeds lost as a result of the continuing chain of payments on false instruments. Thus § 85-5-7 is no impediment to proceeding against the Fund alone in a separate trial. Nor, are instructions apportioning liability appropriate.

¶44. Rules 20 and 42(b) M.R.C.P. give our trial courts broad discretion in determining when and how claims are tried. The judgment in favor of Smith ends the matter for him and ripens First Investors' claim against the banks. Conversely, a judgment in favor of First Investors would have ended the matter for it and left Smith to pursue his claim against the banks and others. We see no prejudice to First Investors and no abuse of the court's discretion here. As such, this Court holds that the lower court acted within its discretion in bifurcating the proceedings.

## VII.

### *a.*

¶45. The Fund contends that the trial court erred in instructing the jury that Rayner's damages were to be determined by the value of the securities at the time of the trial. In order to address the propriety of the trial court's instruction, it is first necessary to determine under which statute the issue should be analyzed.

¶46. Rayner claims that Article 8 of the UCC specifically authorizes restoration of the securities to the position they would have had but for the unauthorized redemption. Miss. Code Ann. §§ 75-8-311(b) and

75-8-404(3). The Fund asserts that Rayner's claim is based on a statute that was amended after his cause of action arose. The Fund argues that before § 75-8-311was amended effective July 1, 1990, the statute only applied to "unauthorized endorsements," and not "instructions."

¶47. The statute as it read prior to the amendment is as follows:

> **§ 75-8-311. Effect of unauthorized indorsement.**
>
> Unless the owner has ratified an unauthorized indorsement or is otherwise precluded from asserting its ineffectiveness
>
> (a) he may assert its ineffectiveness against the issuer or any purchaser other than a purchaser for value and without notice of adverse claims who has in good faith received a new, reissued or re-registered security on registration of transfer; and
>
> (b) an issuer who registers the transfer of a security upon the unauthorized indorsement is subject to liability for improper registration.

As Amended in 1990 the statute read:

> § 75-8-311 Unless the owner or pledgee has ratified an unauthorized endorsement *or instruction* or is otherwise precluded from asserting its ineffectiveness:
>
> (a) he may assert its ineffectiveness against the issuer or any purchaser, other than a purchaser for value and without notice of adverse claims, who has in good faith received a new, reissued, or re-registered *certificated* security on registration of transfer or received an initial transaction statement confirming the registration of transfer, pledge, or release of an equivalent uncertificated security to him; and
>
> (b) an issuer who registers the transfer of a certificated security upon the unauthorized endorsement or who registers the transfer, pledge, or release of an uncertificated security upon the unauthorized instruction is subject to liability for improper registration.

1990 Miss. Laws ch. 384, § 26 (emphasis added).

¶48. The wording of the statute in effect at the time of the illegal $150,000 transfer in March of 1990 does not contain the "or instruction" language. Also absent from the statute in effect at the time of the illegal transfer is the wording "certificated." However, "certificated" does appear in the amendment. According to Rayner's testimony at trial, he never received a certificate for this mutual fund.

¶49. As a result, we conclude that Smith's initial withdrawal of $150,000 from the Fund on March 21, 1990, did not subject the Fund to liability under § 75-8-311 as the transaction involved an unauthorized instruction (not indorsement) and an uncertificated security. However, Smith's September 28, 1990, withdrawal of $37,713.96 was covered by the amendment to § 75-8-311 effective July 1, 1990.

### *b.*

¶50. The court instructed the jury to award damages based on Rayner's calculations of how much the mutual fund investment would have appreciated by the date of the trial if the money had not been paid out.

The Fund claimed this was error and entered an objection that was overruled. However, the Fund did not specifically raise the issue of § 75-8-311's amendment during the trial. Rayner claims that the Fund's present assignment of error regarding the amendment to § 75-8-311 should not be allowed for the first time on appeal. *Meena v. Wilburn*, 603 So. 2d 866, 871 (Miss. 1992) (*citing CIG Contractors, Inc. v. Mississippi State Bldg. Comm'n*, 510 So. 2d 510, 514 (Miss. 1987)).

¶51. In Mississippi "an appellant is not entitled to raise a new issue on appeal, since to do so prevents the trial court from having an opportunity to address the alleged error. *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992).

¶52. However, the trial court granted the instruction over the objection of the Fund. The Fund objected to allowing damages for conversion other than the value of property when converted. Therefore, this Court finds that the Fund's timely objection to this specific instruction sufficiently preserved the error for review on this appeal.

*c.*

¶53. At trial Rayner submitted his Instruction P-9(a) based on Miss. Code Ann. § 75-8-311 and common law conversion. The Fund alleges that the trial court erred by granting Instruction P-9(a). The Fund contends the measure of damages, under the theory of conversion, should have been the value of the shares in the mutual fund at the time Smith deceived the Fund by sending the forged instructions.

¶54. Instruction P-9(a) provided:

> The Plaintiff has sustained a loss of $251,149.76 through January 31, 1995, as a result of the redemptions of his shares in 1990.

> If you find for the Plaintiff, you should award him compensatory damages in the amount of $251, 149.76, but in that event you may consider reducing the amount of any such award, as explained further in the Court's other instructions.

¶55. Regarding conversion damages, we have held that "[t]he measure of damages is the value of the personal property at the time and place of the conversion." *PACCAR Fin. Corp.*, 615 So. 2d at 590; *Masonite Corp. v. Williamson*, 404 So. 2d 565 (Miss. 1981); *See* issue II *supra*.

¶56. The value of the property at the time of Smith's wrongdoing was $187,713.96. The court instructed the jury that Rayner's damages, calculated as of the date of the trial, were $251,149.26, based upon subsequent yields. The jury awarded Rayner half of the amount requested as damages, assessing him half of the fault for his losses.

¶57. Rayner alleges that his damages should be measured by their value on the day they were converted, plus gains lost as a natural consequence of the conversion, to the date of the satisfaction of the judgment. 18 Am. Jur. 2d *Conversion*, §§ 108, 117, p. 222 (1985). The Fund argues that following this rule would place too much emphasis on market fluctuations.

¶58. Notwithstanding the general citation of authority by Rayner calling for damages to include the gains lost as a natural consequence of the conversion, Mississippi still holds "[i]n a suit for conversion, the **value of the personal property at the time and place of the conversion** must be shown to prove the extent of

damages." *Terrell*, 656 So. 2d at 1154 (emphasis added).

¶59. Therefore, under the common law theory of conversion, the measure of Rayner's damages should be the value of the securities at the time of the redemption. Under § 75-8-311, the Fund is only liable for the $37,713.96 transferred in September of 1990. Thus, the trial court's instruction regarding Rayner's damages was improper only as it affected the $150,000 initial transaction and included estimated capital gains on that instead of the value of the property at the time of the conversion. Damages for the $150,000 transaction are limited to the value of the property at the time, to wit $150,000. Damages for the $37,713.96 transaction may include subsequent yields.

## CROSS-APPEAL

## I.

¶60. Rayner contends that the trial court erred in denying his motion for summary judgment, request for a peremptory instruction, and motion for judgment notwithstanding the verdict based on Article 8 of the UCC and the common law of conversion. As viability of these claims have been discussed above and because Rayner was eventually awarded all to which he was entitled these issue need not be addressed.

## CONCLUSION

¶61. This Court remands this case back to the lower court for further proceedings consistent with the findings in this decision.

¶62. **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., SMITH AND WALLER, JJ., CONCUR. McRAE, MILLS AND COBB, JJ., NOT PARTICIPATING**.