# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-01511-SCT

*CAROL D. STEWART*

*v.*

*GULF GUARANTY LIFE INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/12/2000 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL S. ALLRED |
| | J. HAL ROSS |
| | KATHLEEN H. EILER |
| | MARK K. TULLOS |
| ATTORNEY FOR APPELLEE: | DAVID GARNER |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 08/15/2002 |
| MOTION FOR REHEARING FILED: | 9/12/2002 |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Carol D. Stewart ("Stewart") filed this action in the Circuit Court of Smith County on August 29, 1996, against Gulf Guaranty Life Insurance Company ("Gulf Guaranty") based on Gulf Guaranty's denial of benefits under two credit disability insurance policies issued to Stewart. Stewart asserted claims for breach of contract, breach of the duty of good faith and fair dealing, and fraud.

¶2. The case was tried before a jury, and the jury returned a verdict in favor of Stewart. The jury awarded damages of $3,500 for breach of contract and $500,000 for emotional distress. Upon submission of the issue of punitive damages to the jury, the jury awarded $500,000. Circuit Judge Robert G. Evans entered

final judgment on the jury verdict on May 18, 2000.

¶3. Gulf Guaranty filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, or in the further alternative, for a remittitur. The trial court denied the motion as to the damages for breach of contract, but remitted the damages for emotional distress to $50,000 and granted a JNOV as to punitive damages. Final judgment was entered as amended on August 16, 2000. From this amended judgment, Stewart appeals. Stewart asks this Court to reverse the trial court's remittitur and judgment notwithstanding the verdict and to reinstate the jury's award of damages with interest and costs. Gulf Guaranty has not cross-appealed.

¶4. We affirm the jury verdict and judgment of $3,500 contractual damages. However, we find that the trial judge erred in granting a supposed remittitur which in actuality was the grant of a partial JNOV. We, therefore, reinstate the jury award of $500,000 for emotional distress.

¶5. We also hold that the trial court erred in granting a JNOV as to punitive damages. Sufficient evidence was presented to the jury whereby the jury could have reasonably concluded gross negligence due to Gulf Guaranty's conduct. The jury award of $500,000 punitive damages is reinstated.

## FACTS

¶6. On August 2, 1995, Stewart went to the Community Bank of Raleigh, Mississippi, to obtain a loan in the amount of $711.12. The loan officer, Mike Stubbs, offered Stewart credit life and disability insurance on the loan. The insurance offered to Stewart was issued pursuant to a group policy issued by Gulf Guaranty to Community Bank. Pursuant to its agreement with Gulf Guaranty, Community Bank retained 45% of the premiums collected as commission for offering the insurance to is customers.[1] Customers purchasing the insurance were not given copies of the master policy between Gulf Guaranty and Community Bank, but they should have received a certificate of insurance, which contained the terms of the policy.[2]

¶7. Stewart testified that when Stubbs offered him the insurance, he asked Stubbs "what did it pay," to which Stubbs responded that the insurance would make the loan payments if Stewart became sick or disabled. Stubbs did not ask Stewart any questions about his health and did not explain anything about the terms of the policy to Stewart. Though Stewart initialed the provision on the loan documents stating that he wished to purchase the insurance, he was not asked to complete or sign the insurance application, which contained health-related questions.

¶8. Stewart returned to Community Bank on March 5, 1996, to obtain another loan in the amount of $4,005.18. Raymond McAlpin, the loan officer, testified that Stewart requested the insurance, while Stewart testified that McAlpin offered the insurance to him. Regardless, Stewart again accepted the insurance. McAlpin did not ask Stewart any health questions, nor did he require Stewart to sign an application for insurance. McAlpin did not explain any of the terms of the policy to Stewart. McAlpin testified that it was not the practice of the bank to go over the terms of the policy with its customers, but that the bank would answer questions if the customer had any.

¶9. Stewart, who has only an eighth-grade education, is illiterate. Stewart's testimony is inconsistent as to whether he actually received the certificates of insurance, which contain the policy terms. McAlpin testified that it was the practice of the bank to place the certificate, along with a copy of the bank note, in an envelope to be given to the customer. Stewart initially testified that he received no papers to take home

from the bank on either of two occasions. However, Stewart testified on cross-examination that he did not know whether he received a copy of the certificate. He stated that he did receive an envelope of documents at the bank, but that he never opened the envelope. Stewart's wife, who was present when the second loan was made, testified that they were given an envelope containing documents, but that neither looked in the envelope after arriving home.

¶10. Stewart, who was diagnosed with spinal arthritis in 1994, became permanently disabled in June 1996. Stewart filed a claim with Gulf Guaranty on August 20, 1996. On the claim form, Stewart's attending physician, Dr. Charles Pruitt, stated, "Due to the arthritis, he will not be able to hold a job (he is permanently disabled)." Dr. Pruitt stated on the form that he had been treating Stewart for his condition since 1990. There is no dispute that Stewart's condition was preexisting.

¶11. Ellen Methvin, vice president of Gulf Guaranty and the sole person responsible for handling claims for the company, denied Stewart's claim by letter dated August 21, 1996. As basis for the denial, the letter cited the preexisting condition exclusion contained in the policy and set forth on the certificate of insurance. The letter also stated, "As your doctor has stated that your disability is permanent and as it is not covered under your policy, we will be happy to give you a complete disability premium refund upon your written request." Stewart did not request a refund.

¶12. In his complaint, Stewart alleged breach of contract, breach of the duty of good faith and fair dealing, and fraud. The crux of Stewart's argument at trial was that Gulf Guaranty had illegally taken a policy that had been approved by the Department of Insurance as one requiring underwriting and converted it, by not requiring the insured to answer the questions on the application, to a guaranteed issue policy. Stewart argued that the terms of the policy, as written and as applied, were inconsistent and allowed Gulf Guaranty to increase profits by facilitating the collection of premiums in cases where the insured, in this case, Stewart, was actually uninsurable, and where no benefits would be paid by virtue of the preexisting condition exclusion. Stewart alleged that this practice resulted in post-claims underwriting.

¶13. The master policy issued to Community Bank states that the contract includes "the policy, the application, any endorsements, and the ... copies of the individual certificates." The master policy contained the following exclusion for pre-existing conditions:

> The disability insurance coverage under this Policy does not cover total disability contributed to or caused by: (1) injury which was intentionally inflicted on the Insured Debtor by himself; (2) pregnancy, childbirth, or any complications thereof; and (3) *pre-existing illness, disease or physical condition for which the Insured Debtor either: (a) knew the existence of such illness, disease or condition on the effective date, or (b) received medical advice, consultation or treatment during the twelve (12) month period immediately preceeding the Date of Loan*.

(emphasis added). This exclusion was also contained on the back of the insured debtor's certificate of insurance.[3] However, the exclusion was typed in 6-point print rather than the requisite 10-point print.[4]

¶14. The application, which was found on the back of Gulf Guaranty's copy of the certificate, contained questions regarding the insured debtor's health. The application stated:

> 1. Have you ever had or been told that you had (a) cancer, (b) a heart attack, or (3) angina pectoris?

> 2. *Have you had any other sickness, accident, impairment or health for which you have*

*received advise, diagnosis, or treatment from a physician or other health official within the last three years?*

*If (1) or (2) is YES; who is the doctor who can give us the most up-to-date report about your health?*

(emphasis added). At the bottom of the application was a place for the signature of the insured debtor as well as the agent.

¶15. Stewart was not required to answer the questions on the application and was never shown the application. Raymond McAlpin testified that he was not even aware the application was on the back of the certificate and that Gulf Guaranty had never required the bank to fill out the application.

¶16. Harland Dyer, an actuary for the Mississippi Department of Insurance, testified that the policy, as approved by the Department, did not appear to be a guaranteed issue policy. Dyer testified that the language of the policy itself indicated that it was a policy which contemplated that the risks insured thereby would be underwritten. First, the application contained health related questions, commonly used to aid insurance companies in underwriting a policy. Second, the policy and certificate contained a provision titled "Right of Cancellation," which stated:

The Company may cancel or decline the insurance on any Insured Debtor by writing to the Creditor and returning the premium paid for such insurance coverage within ninety days of the Date of Loan. If the Insured Debtor dies within ninety days of the Date of Loan and the Company would have declined the insurance coverage based upon its usual underwriting practices, then no such insurance shall have been in force and the Company shall only be liable for return of premiums for such insurance.

Third, the policy stated that each debtor who is in insurable health as of the date of the loan is eligible for insurance as provided by the policy. Gulf Guaranty's expert agreed that the policy, as written, was not guaranteed issue, but that, at least in Stewart's case, it was issued on a guaranteed issue basis.

¶17. Dyer testified that any change in a policy after its approval by the Department requires that the policy be resubmitted for approval.[5] Dyer stated that taking the application out of the policy and, thus, applying the policy on a guaranteed issue basis, constituted an amendment to the policy which would require resubmission. Dyer testified that the Department would not approve a policy of credit insurance that was guaranteed issue, yet excluded all preexisting conditions. Dyer stated that the policy must give the insured the opportunity to disclose that he has a preexisting condition. Dyer explained that if Gulf Guaranty excluded the application and did not give the insured the opportunity to disclose he had a preexisting condition, the policy should cover the preexisting condition.

¶18. The testimony of Stewart's expert, Michael Barranco, was similar to that of Dyer. Barranco explained that whether the policy was one requiring underwriting or guaranteed issue was important because had Gulf Guaranty performed the underwriting function contemplated by the policy, Stewart would not have been issued the policy at all. Ellen Methvin testified at trial that Stewart was insurable despite his preexisting condition, but she testified at her deposition that Stewart was not in insurable health as of the loan date.

¶19. Barranco testified that Gulf Guaranty should have performed the underwriting process called for in the policy and that, had Gulf Guaranty done so, Stewart would have been told either that he was not in insurable health or that the preexisting, arthritic condition was specifically excluded. In Barranco's opinion,

the exclusion was not clear and conspicuous (due to the size of the print); the exclusion was not made known to Stewart, who could not read; and the policy provisions regarding insurable health and the preexisting exclusion were inconsistent and misleading.

¶20. Again, the jury returned a verdict against Gulf Guaranty, awarding damages of $3,500 for breach of contract, $500,000 for emotional distress, and $500,000 in punitive damages. The trial court ordered a remittitur of the damages for emotional distress to $50,000 and granted Gulf Guaranty's motion for jnov as to the punitive damages. Gulf Guaranty has not appealed the verdict against it. Stewart has appealed, requesting reinstatement of the original jury verdict. He raises two issues:

> **I. WHETHER THE TRIAL COURT ERRED BY ORDERING A REMITTITUR OF DAMAGES FOR EMOTIONAL DISTRESS.**

> **II. WHETHER THE TRIAL COURT ERRED BY GRANTING GULF GUARANTY'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AS TO PUNITIVE DAMAGES.**

## I.

¶21. Stewart argues that the trial court erred by ordering a remittitur of damages for emotional distress from $500,000 to $50,000. As a preliminary argument, however, Stewart contends that the trial court's reduction of these damages was not a remittitur, but was actually a partial JNOV. Because the determination of the nature of the trial court's reduction affects the standard of review employed on appeal, we must first address this threshold matter.

## A.

¶22. The trial court, upon consideration of Gulf Guaranty's Motion for Judgment Notwithstanding the Verdict, or in the alternative, for a New Trial, or in the further alternative, for a Remittitur, found as follows:

> . . .

> (2) That at the trial on the merits, the jury returned a verdict of five hundred thousand dollars ($500,000.00) for emotional distress; that said portion of the jury's verdict was not supported by the evidence, was shocking to the conscious [sic], and was so excessive as to evidence bias, prejudice, or passion; that a remittitur of four hundred fifty thousand dollars ($450,000.00) should be granted; and that the remaining fifty thousand dollars ($50,000.00) in damages for emotional distress should be awarded;

> . . . .

Stewart argues that though the trial court labeled its reduction a "remittitur," it failed to give Stewart the alternative of a new trial on damages in lieu of accepting the remittitur as provided by Miss. Code Ann. § 11-1-55 (1991). Stewart contends that this Court should, therefore, treat the reduction of damages as a partial JNOV.

¶23. This Court addressed a similar issue in *Investors Property Mgmt., Ltd. v. Watkins, Pitts, Hill & Assocs.*, 511 So. 2d 1379 (Miss. 1987). In *Investors*, the jury returned a verdict against the defendants,

and the trial court ordered what it referred to as a "remittitur." *Id.* at 1380. As in the case sub judice, nothing in the order directed a new trial in the event the plaintiffs refused to accept the remittitur. *Id.* The plaintiffs appealed, seeking restoration of the full judgment to its original sum. *Id.* They argued that the order reducing damages was not a true remittitur in the sense that they had never been given an election to accept or reject the remittitur on condition of a new trial. *Id.* This Court stated:

> The problem is that the order of the Circuit Court is not an order for remittitur either in form or substance. The formal deficiency is the absence of a conditional order for a new trial. In the ordinary case such an order for remittitur provides that the judgment be reduced to a given amount upon the condition that, if the plaintiff accepts that reduction, the judgment is final, but that, in the alternative, if the plaintiff rejects the remittitur, then the order is treated as one for a new trial. In the latter event, the matter is available for a new trial on the question of damages only.

*Id.* at 1381. The Court stated that the "glaring absence of any order for a new trial" reinforced its conclusion that the trial court's findings "may only be interpreted as a determination that, with respect to the original judgment, Watkins, Pitts was granted judgment in its favor as a matter of law notwithstanding the verdict of the jury." *Id.* at 1382.

¶24. Because the order in the case sub judice contains the same deficiency, our holding in *Investors* requires that we likewise hold that what the trial court labeled a "remittitur" was actually a partial JNOV.

### B.

¶25. Our standard of review when a judgment notwithstanding the verdict has been entered requires that we view the evidence most favorable to Stewart and grant him the benefit of all favorable inferences which may reasonably be drawn from the evidence. *Tharp v. Bunge Corp.*, 641 So. 2d 20, 23 (Miss. 1994); *Stubblefield v. Jesco, Inc.*, 464 So. 2d 47, 49 (Miss. 1985).

¶26. The evidence offered to prove emotional distress was as follows. Stewart testified that because of the economic strain caused by Gulf Guaranty's denial of his claim, his family was forced to file for food stamps, a source of embarrassment for Stewart. Stewart testified that he suffered from anxiety, crying spells, and difficulties sleeping and eating. He experienced weight loss. Mrs. Stewart's testimony corroborated that of her husband. Both testified that Stewart had no such problems prior to Gulf Guaranty's denial of his claim.

¶27. Dr. Mark Allen, the family practitioner who treated Stewart at Weems Mental Health Facility, began treating Stewart in October 1996. He testified that Stewart was severely depressed, extremely anxious, and suffered from stress-induced obsessive compulsive disorder. Dr. Allen prescribed anti-depressants for Stewart for more than seventeen months.

¶28. Clearly, Stewart demonstrated compensable damages for mental anguish and emotional distress. *See Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290 (Miss. 1992) (worry, anxiety, insomnia, depression, difficulty coping with daily life as compensable damages). Viewing the evidence most favorable to Stewart and granting him the benefit of all favorable inferences which may reasonably be drawn from the evidence, we find there was substantial evidence in support of the jury's award of damages. Thus, the trial court erred in granting a partial JNOV as to the jury's award of damages in excess of $50,000.

### II.

¶29. Stewart also argues that the trial court erred by granting a JNOV as to punitive damages. Specifically, the trial court found that the preexisting condition clause in the policy constituted an arguable reason for denial of Stewart's claim and that, therefore, the issue of punitive damages should not have been submitted to the jury.

¶30. In cases such as that at bar, the trial judge is responsible for reviewing all the evidence before it in order to determine whether the issue of punitive damages should be submitted to the jury. *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1183 (Miss. 1990). If the trial judge determines that as a matter of law it cannot hold that the insurer had a legitimate and arguable defensive position, but that the evidence constituted disputed facts as to whether such situation existed, the trial judge should submit the arguable basis and punitive damages issues to the jury. *Id.* at 1185 (citing *Reserve Life Ins. Co. v. McGee*, 444 So. 2d 803, 809 (Miss. 1984)). In these cases, the judge may upon post-verdict motion and upon reflection find: (1) that the insurer did have an arguable basis for denial of the claim; (2) that the punitive damages issue should not have been submitted to the jury; and (3) that an award of punitive damages under the facts and circumstances was inappropriate as a matter of law. *Id.* This occurred in the case at bar.

¶31. When a JNOV has been entered by the trial court, this Court is required to review the evidence in the light most favorable to the appellant, disregarding any evidence of the appellee in conflict with the evidence favorable to the appellant. *Tharp v. Bunge Corp.*, 641 So. 2d 20, 23 (Miss. 1994) (citing *Waller v. Dixieland Food Stores, Inc.*, 492 So. 2d 283, 286 (Miss.1986)). "If the evidence and the reasonable inferences drawn therefrom would support a verdict for the appellant, then the verdict must be reinstated." *Id.*

¶32. Before punitive damages may be recovered from an insurer, the insured must prove by a preponderance of evidence that the insurer acted with (1) malice, or (2) gross negligence or reckless disregard for the rights of others. *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 293 (Miss. 1992); *Weems v. American Sec. Ins. Co.*, 486 So. 2d 1222, 1226-27 (Miss.1986). If the insurer had a legitimate or arguable reason to deny payment of the claim, then the trial judge, after reviewing all the evidence, should refuse to grant a punitive damage instruction. *Pioneer Life Ins. Co. v. Moss*, 513 So. 2d 927, 929 (Miss.1987). "Arguably-based denials are generally defined as those which were rendered upon dealing with the disputed claim fairly and in good faith." *Williams*, 566 So. 2d at 1184.

¶33. These principles, however, are not ironclad. *Williams*, 566 So. 2d at 1185. Even in the absence of an arguable basis for the denial or breach of a policy claim, submission of the punitive damages issue may not be warranted. *Veasley*, 610 So. 2d at 293 (citing *Pioneer Life*, 513 So.2d at 930). "Indeed, 'the fact that an insurance company lacks a legitimate or arguable reason for denying a claim *does not automatically lead to the conclusion that the issue of punitive damages should be submitted to the jury.*'" *Id.* (quoting *Pioneer Life*, 513 So. 2d at 930) (emphasis in original). Where an arguable reason for denying a claim is absent, the trial court still must determine whether there is a jury issue as to the insurer's having committed a willful or malicious wrong, or acted with gross or reckless disregard for the insured's rights. *Pioneer Life*, 513 So. 2d at 930. If not, the question of punitive damages should not go to the jury. *Id.*

¶34. Conversely, this Court has recognized that the issue of punitive damages may be submitted, notwithstanding the presence of an arguable basis, where there is a question that the mishandling of a claim

or the breach of an implied covenant of good faith and fair dealing may have reached the level of an independent tort. *Lewis v. Equity Nat'l Life Ins. Co.*, 637 So. 2d 183, 185 (Miss. 1994) (citing *Williams*, 566 So. 2d at 1186).

¶35. The question before this Court is whether Gulf Guaranty breached its contract with Stewart in such a way as to amount to an intentional wrong, or in doing so whether its conduct was so grossly negligent that the breach constituted an independent tort. *Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254, 269 (Miss. 1985), *aff'd*, 486 U.S. 71, 108 S. Ct. 1645, 100 L. Ed 2d 62 (1998). These criteria require an evaluation of the conduct of Gulf Guaranty in handling this claim, as well as the reason given for denying the claim. *Crenshaw*, 483 So. 2d at 269.

¶36. Stewart first contends that the trial court's refusal to grant Gulf Guaranty's motion for JNOV as to damages for emotional distress is irreconcilable with the trial court's grant of JNOV as to punitive damages. Stewart argues that the jury's award of damages for emotional distress necessarily indicates that the jury found that Gulf Guaranty's denial of Stewart's claims was done with gross negligence and reckless disregard for Stewart's rights and without arguable reason. Stewart argues that this "mutual repugnance" cannot be resolved except by reinstating the original judgment. Stewart is mistaken. This Court, in *Veasley*, held that punitive damages were unwarranted despite the fact it also upheld an award of damages for mental anguish and mental distress. *Veasley*, 610 So. 2d at 294-95. Certainly, though, even in the presence of an arguable basis for denial, an insurer could conceivably be held liable for punitive damages for infliction of emotional distress through commission of sufficiently-repugnant acts in dealing with the insured and disputed claim. *Williams*, 566 So. 2d at 1186.

¶37. Gulf Guaranty asserts that preexisting condition exclusions, such as that set forth in the policy at issue, are valid under Mississippi law. *See Pongetti v. First Cont'l Life & Acc. Co.*, 688 F. Supp. 245 (N.D. Miss. 1988); *Pace v. Fin. Sec. Life of Miss.*, 608 So. 2d 1135 (Miss. 1992). Because there is no dispute that Stewart's condition existed at the time the policy became effective, Gulf Guaranty contends that it was entitled to rely on the exclusion.

¶38. Stewart's argument is basically one of waiver or estoppel - that Gulf Guaranty is estopped from relying on the exclusion to deny coverage because it failed to ask Stewart the health questions contained on the application. Without dispute, Stewart's claim falls within the terms of the preexisting condition exclusion set out in the certificate of insurance. Mississippi law is clear that the doctrines of waiver and estoppel may not operate to create coverage or expand existing coverage to risks which, by the terms of the policy, are expressly excluded." *Pace v. Fin. Sec. Life of Missi.*, 608 So. 2d 1135, 1140 (Miss. 1992) (citations omitted); *Employers Fire Ins. Co. v. Speed*, 242 Miss. 341, 346, 133 So. 2d 627, 629 (1961); *See also Pongetti v. First Cont'l Life & Acc. Co.*, 688 F. Supp. 245, 248 (N.D. Miss. 1988) (citing *Miss. Hosp. & Medical Serv. v. Lumpkin*, 229 So. 2d 573, 576 (Miss. 1969)).

¶39. This Court finds, as did the trial court, that Gulf Guaranty had a legitimate or arguable basis for denying the claim. The inquiry, however, does not stop with this conclusion as this Court has recognized that the issue of punitive damages may be submitted to a jury under certain circumstances even where an arguable basis defense exists. *Andrew Jackson Life Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1186 (Miss. 1990).

¶40. Viewing the evidence in the light most favorable to Stewart, we find that there was a question for the jury as to whether Gulf Guaranty acted with, at a minimum, gross negligence or reckless disregard for

Stewart's rights. Though Stewart makes the following arguments in the context of asserting that Gulf Guaranty lacked an arguable reason for denial of his claim, in our view they more aptly demonstrate a breach of an implied covenant of good faith and fair dealing that may have reached the level of an independent tort. *See Lewis v. Equity Nat'l Life Ins. Co.*, 637 So. 2d 183, 185 (Miss. 1994) (citing *Andrew Jackson Life Life Ins. Co. v. Williams*, 566 So. 2d at 1186) (issue of punitive damages may be submitted to jury where evidence demonstrates such conduct).

¶41. Stewart argues that by failing to require him to complete the application attached to the policy, Gulf Guaranty amended the policy without prior approval of the Department of Insurance. The testimony of Harland Dyer, an actuary for the Department of Insurance, and Michael Barranco, Stewart's expert, supports this argument. The testimony of both witnesses indicates that the policy, approved as a policy which required underwriting, misrepresents to the insured the risks assumed by Gulf Guaranty when applied on a guaranteed issue basis. The testimony indicated that, had the policy been underwritten, Stewart either would have been deemed uninsurable, or Gulf Guaranty would have issued an endorsement specifically excluded losses arising out of the preexisting condition as disclosed in the application. Instead, the policy was applied on a guaranteed issue basis in which no questions were asked and all claims arising out of preexisting conditions were automatically excluded.

¶42. Certainly, the certificate contained the preexisting condition exclusion. There was, however, some question as to whether Stewart actually received the certificate.[(6)] Furthermore, the exclusion was in six-point type rather than the requisite ten-point type. And, regardless, Stewart could not read. The only information orally presented to Stewart was that given by the first loan officer who told Stewart, in general terms, that the insurance would make the loan payments if Stewart became sick or disabled. Stewart testified that he would not have taken out the loan or insurance had he known of the preexisting condition exclusion.

¶43. Stewart argues that considering the bank's superior bargaining position and Stewart's illiteracy, Community Bank (and Gulf Guaranty by way of agency principles) breached its duty as a fiduciary when it failed to inform Stewart of the preexisting condition exclusion. Gulf Guaranty does not dispute that Community Bank became Stewart's agent for the procurement of the insurance or that, as such, it owed Stewart a duty of utmost good faith and reasonable care. *See First United Bank of Poplarville v. Reid*, 612 So. 2d 1131, 1137 (Miss. 1992). Neither is Community Bank's agency relationship with Gulf Guaranty in dispute. This Court has explained that a lender acting as a credit insurance agent "must make known to his principal all material facts within his knowledge which may in any way affect the transaction and the subject matter of his agency." *Id.* at 1137-38 (quoting *Browder v. Hanley Dawson Cadillac, Co.*, 379 N.E.2d 1206, 1211 (Ill. App. Ct. 1978)). Also, one offering credit insurance is held to the same standards as those dealing in other types of insurance. *Id.* at 1138.

¶44. The testimony indicated that the loan officers had received training in the sale of Gulf Guaranty's policies, yet Raymond McAlpin testified that he was not even aware that an application with health related questions was found on the back of Gulf Guaranty's copy of the certificate. Without dispute, no one at the bank reviewed the terms or benefits of the policy with Stewart. Even assuming Stewart was given a copy of the certificate, he could not read it. And even had Stewart been able to read, the minuscule print size of the exclusion failed to meet that required by statute. The jury certainly could have concluded that the loan officers' failure to review the terms of the policy, particularly in light of Stubbs's generalized assertion that the insurance would make Stewart's loan payments if he was ever disabled, was a breach of fiduciary duty

which rose to the level of gross negligence.

¶45. Stewart also complains of the manner in which Gulf Guaranty handled his claim. Stewart first argues that Gulf Guaranty failed to conduct an adequate investigation into his claim. Ellen Methvin testified that Gulf Guaranty has no written claims procedures as well as no medical director or consultant. Methvin stated that she alone is responsible for determining whether a claim is covered under the policy. Methvin testified that she denied the claim the same day it was received by Gulf Guaranty and that she relied solely on the information contained in the claim form submitted by Stewart. This information included the statement by Dr. Pruitt that he had been treating Stewart for arthritis since 1990 and that arthritis was the cause of Stewart's disability.

¶46. This Court has held that the denial of a claim without proper investigation may give rise to punitive damages. *Lewis*, 637 So. 2d at 187; *Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d at 276. "Proper investigation ... means obtaining 'all available medical information relevant to [the policyholder's claim.'"*Id.* (quoting *Crenshaw*, 483 So. 2d at 272). This Court explained in *Lewis*:

> [B]efore denying a claim, the insurer, at a minimum, must determine whether the policy provision at issue has been voided by a state or federal court, interview its agents and employees to determine if they have knowledge relevant to the claim, and make a reasonable effort to secure all medical records relevant to the claim.

*Lewis*, 637 So. 2d at 187 (citing *Eichenseer v. Reserve Life Ins. Co.*, 682 F. Supp. 1355, 1366 (N.D. Miss. 1988)). Methvin admits that she did no investigation before denying Stewart's claim. In fact, Methvin, in her letter, attempted to place the burden of submitting information regarding the claim on Stewart. The letter states:

> The denial of your claim was based upon the information available to us as of this date. If you have any correctional or additional information which may have a bearing on this claim, please let us know immediately so that we may review your claim.

This evidence suggests that there exist questions of fact regarding the adequacy of Gulf Guaranty's investigation of Stewart's claim and that the jury could have properly concluded that such a failure evidenced bad faith and gross negligence, entitling Stewart to an award of punitive damages.

¶47. Furthermore, there was evidence presented which would support a conclusion by the jury that Gulf Guaranty attempted to engage in post-claims underwriting in dealing with Stewart's claim. Post-claim underwriting occurs when an insured pays premiums and operates under the assumption he is insured against a specified risk, only to learn after he submits a claim that he is not insured. *Lewis*, 637 So. 2d at 188. Methvin's letter denying Stewart's claim stated:

> As your doctor has stated that your disability is premanent [sic] and as it is not covered under your policy, we will be happy to give you a complete disability premium refund upon your written request.

Stewart never requested a return of his premiums, and the policy remained in effect.

¶48. Gulf Guaranty asserts that post-claims underwriting did not occur because Stewart's policy was not rescinded and was left in full force and effect, even after his claim was denied. Gulf Guaranty asserts, and so stated in Methvin's letter to Stewart, that it denied Stewart's claim based on the preexisting condition

exclusion. However, Methvin testified in her deposition that Stewart was uninsurable at the time he purchased the policy. Methvin testified that she did not deny Stewart's claim because she determined Stewart was not an insurable risk. This assertion, however, is inconsistent with Gulf Guaranty's offer to rescind the policy and Methvin's deposition statement that Stewart was uninsurable. Methvin acknowledged that small policies such as that issued to Stewart are issued under simplified guidelines requiring no inquiry into the insured's health condition. Clearly, no effort was made by Gulf Guaranty to determine whether Stewart was in insurable health at the time the policy was issued. Though a guaranteed issue policy contemplates no such determination, the policy at issue was not approved as a guaranteed issue policy, and its provisions deceptively indicate that a risk determination of the insured's health will be conducted prior to the policy being issued.

¶49. Viewing this evidence in the light most favorable to Stewart, the jury had before it evidence that Gulf Guaranty issued as guaranteed issue a policy which contemplated underwriting, then, upon Stewart's submission of a claim, determined him to be "uninsurable" and attempted to treat him as such by "offering" to rescind his policy, while stating that it was relying on the preexisting condition exclusion.

## CONCLUSION

¶50. Because there was substantial evidence in support of the jury's award of damages for emotional distress, we find that the trial court erred in granting the partial JNOV. The judgment reducing those damages to $50,000 is reversed, and the original judgment on the jury's award of $500,000 for emotional distress is reinstated.

¶51. Additionally, the trial court erred in granting Gulf Guaranty's motion for judgment notwithstanding the verdict as to punitive damages. Though the preexisting condition exclusion constituted an arguable basis for Gulf Guaranty's denial of Stewart's claim, the evidence at trial demonstrated a breach of the implied covenant of good faith and fair dealing which the jury may well have concluded reached the level of an independent tort. The jury had before it evidence from which it could reasonably conclude that Gulf Guaranty's conduct was grossly negligent. The trial court's judgment granting Gulf Guaranty's motion for JNOV as to punitive damages is reversed, and the original judgment on the jury's award of punitive damages in the amount of $500,000 is reinstated.

¶52. The judgment entered on the jury's award of contractual damages in the amount of $3,500 is affirmed.

¶53. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**McRAE, P.J., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. COBB, J., CONCURS IN PART. PITTMAN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER AND COBB, JJ. DIAZ, J., NOT PARTICIPATING.**

**PITTMAN, CHIEF JUSTICE, DISSENTING:**

¶54. I disagree with the majority's restoring the $500,000.00 damage award for emotional distress and the majority's conclusion that punitive damages are warranted. Therefore, I respectfully dissent. This case should be remanded for a new trial on emotional distress damages and the trial court's order granting Gulf Guaranty a judgment notwithstanding the verdict as to punitive damages should be affirmed.

¶55. The majority's holding transforms the express language of the trial court's order granting a remittitur

from that of the standard we employ when examining excessive jury verdicts into that of an order granting a partial j.n.o.v. The trial court's order reads in relevant part as follows:

> (2) That at the trial on the merits, the jury returned a verdict of five hundred thousand dollars ($500,000.00) for emotional distress; that said portion of the **jury's verdict was not supported by the evidence, was shocking to the conscious [sic], and was so excessive as to evidence bias, prejudice, or passion**; that a **remittitur** of four hundred fifty thousand dollars ($450,000.00) should be granted; and that the remaining fifty thousand dollars ($50,000.00) in damages for emotional distress should be awarded.
>
> . . . .
>
> IT IS, THEREFORE, ORDERED AND ADJUDGED . . . that a **remittitur** of four hundred fifty thousand dollars ($450,000.00) is hereby granted on the damages awarded for emotional distress; that a judgment in the amount of fifty thousand dollars ($50,000.00) as damages for emotional distress should be enrolled . . .

(emphasis added). By comparison, our remittitur statute provides:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or **remittitur**, if the court finds that the damages are **excessive** or inadequate for the reason that **the jury or trier of facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming <u>weight</u> of credible evidence**. . . .

Miss. Code Ann. § 11-1-55 (1991)(emphasis added). Surely the trial court was announcing its intention to grant Gulf Guaranty a remittitur, not a partial j.n.o.v. as the majority holds. More substance exists to this order presently before us than the one in *Investors Property Mgmt., Ltd. v. Watkins, Pitts, Hill & Assocs.*, 511 So. 2d 1379 (Miss 1987), as this order specifically states the statutory test for granting a remittitur. It cannot be confused with anything else. This is true even if the trial judge inadvertently did not include in his "final judgment" a reference to granting a new trial on damages if Stewart rejected the remittitur. Here we have a remittitur, so stated the trial judge.

¶56. Without question, a trial court cannot enter a remittitur or an additur over the objection from the party whose judgment would be adversely affected.[7] The trial court may only <u>suggest</u> the extent of either remedy and condition a new trial upon the rejection of the offer. *Odom v. Roberts*, 606 So. 2d 114, 120 (Miss. 1992)(citing *Flight Line, Inc. v. Tanksley*, 608 So. 2d 1149 (Miss. 1992); *Altom v. Wood*, 298 So. 2d 700, 702 (Miss. 1974)). *See also Dorris v. Carr*, 330 So. 2d 872, 873 (Miss. 1976). A trial court may never <u>substitute</u> its own valuation of damages for that of the jury's verdict. *See Holmes County Bank & Trust v. Staple Cotton Co-op*, 495 So. 2d 447, 451 (Miss. 1986). Therefore, the rule is that a trial court's suggested remittitur carries with it the promise of a new trial conditioned upon rejection of the remittitur by the plaintiff regardless of whether the language appears in the judgment. The trial court simply cannot reduce an award for a certain type of damages by j.n.o.v. without entirely wiping it out.

¶57. However, the majority cites *Investors Property*, a case not even decided on the merits, for the proposition that where a few words concerning a new trial are absent from a remittitur order, it is transformed into a partial j.n.o.v. It is apparent that criticism of *Investors Property* is long overdue.

***Investors Property*** came before this Court by motion of the appellee who contended that an appeal from the trial court was improper because the trial court had not rendered a final judgment. ***Id.*** at 1380. The appellee had not even filed a reply brief nor had it certified any issues for cross-appeal. ***Id.*** at 1382. In that case, the trial court *included* language in its "judgment" indicating a new trial was granted "in lieu" of the plaintiff rejecting the remittitur, which the plaintiff had done. ***Id.*** at 1380. Just before the plaintiff made its objection known, however, it appealed the trial court's "judgment." This Court was faced with the prospect that the appeal was indeed premature.[8] Instead of allowing the trial court the opportunity to order a new trial on damages, however, this Court issued an atypical opinion concerning the motion which improperly characterized the trial court's "judgment" as granting a partial j.n.o.v.[9] By holding as it does to day, the majority makes the mistake of ***Investors Property***, removes a remedy available to the objecting parties at the trial level, and forces them into a premature appellate review.

¶58. Furthermore, in ***Investors Property***, this Court neglected to note that just eight months earlier, it said that the j.n.o.v. was "the wrong vehicle for adjusting the jury's verdict." ***Cherry v. Anthony, Gibbs, Sage***, 501 So. 2d 416, 421 (Miss. 1987). After a trial court had attempted to reduce the jury's award by the form of a j.n.o.v., this Court stated, "Instead of issuing a judgment notwithstanding the verdict, he [the trial court] should have granted the motion for new trial or denied it on condition of plaintiffs accepting the remittitur."***Id.*** This indicates that the appellees in ***Investors Property*** were correct. This Court should have given the trial court the opportunity to grant a new trial on damages. However, it reached the mysterious conclusion that the j.n.o.v. motion which ordinarily examines the <u>sufficiency</u> of the evidence can also be applied to situations where the <u>weight</u> of the evidence is actually considered. *Compare* **[Brandon HMA, Inc. v. Bradshaw](#)**, 809 So. 2d 611, 615 (Miss. 2001)(standard of review for j.n.o.v.), *with* ***Green v. Grant***, 641 So. 2d 1203, 1208 (Miss. 1994)(standard of review for new trial).

¶59. I find the notion that a partial j.n.o.v. can *reduce* the amount of damages awarded in a particular category *without nullifying* the entire award in that category difficult to support. After all, a j.n.o.v. speaks to the <u>sufficiency</u> of the evidence offered, not its <u>weight</u>. *See **Odom***, 606 So. 2d at 119. If a plaintiff has not put on any evidence or only negligible evidence of damages of a particular type, then we would say that the evidence is <u>insufficient</u> as a matter of law to support *any* jury award for damages of that specific type. *See **Aldridge v. Johnson***, 318 So. 2d 870 (Miss. 1975). *Cf. **Stratton v. Webb***, 513 So. 2d 587, 590 (Miss. 1987)("His testimony, taken as a whole, *sufficiently* established a reasonable medical certainty that the accident caused the injuries)(emphasis added). However, where the evidence is sufficient to allow the jury to award damages of a certain type, the court is permitted to review that award and to state if the amount awarded shocks the conscience in light of the weight of the evidence submitted at trial. *Cf. **Stratton***, 513 So. 2d at 591 ("It is apparent that the trial judge gave consideration to the *total circumstances*, including the *aggravating effect* of the subsequent injuries in this case.")(emphasis added). Therefore, a trial court can grant a j.n.o.v. as to the entire amount awarded by the jury for one type of damages (this would be a partial j.n.o.v. as to the entire verdict), but not reduce the amount of damages awarded for that type of damages by j.n.o.v. Under our jurisprudence, this is properly accomplished through the vehicle of the remittitur.

¶60. We should not repeat the same mistake made in ***Investors Property***. As this case now stands, Stewart has won the day with the jury. However, the trial judge's judgment below is better characterized as a remittitur rather than a j.n.o.v. The trial court merely committed a scrivener's error by failing to include language in the order indicating a new trial was conditional on rejection of the remittitur. He could not, and cannot, grant the remittitur over Stewart's objection. The appeal before us as it concerns this element of

damages is therefore premature because Stewart, as Gulf Guaranty acknowledges in its brief, objects to the $450,000.00 suggested remittitur of the emotional distress damages offered by the trial court. The only thing remaining for the trial court to do is order a new trial on emotional distress damages. Even on appeal, when this Court orders a remittitur or additur, we remand to the trial level for either acceptance of the order by the affected party or for a new trial on damages. *See Odom*, 606 So. 2d at 122 (see mandate); *Dorris*, 330 So. 2d at 875; *Aldridge*, 318 So. 2d at 873 (and mandate). A new trial on emotional distress damages is warranted here. Trial courts of this state, to avoid this problem in all future cases warranting additur or remittitur, should be acutely mindful to always include language conditioning the grant of a new trial upon rejection of the offer by the adversely affected party.

¶61. In the alternative, I would affirm the trial court's remittitur of the emotional distress damages or have this Court suggest one of the same amount. The jury's award is approximately 142 times the amount of actual damages awarded and is equal to the amount of punitive damages awarded in this case. I cannot agree with the majority that it is clear that Stewart put on proof enough to warrant a $500,000.00 award for emotional distress damages. The trial court was struck, as am I, by how the award is considerably disproportionate to the special damages. While the trial court and I agree that some award for emotional distress damages may be appropriate (the trial court, after all, thought $50,000.00 was worthy compensation), the majority stops with its analysis here instead of acknowledging that sufficient evidence to warrant an award for damages does not entitle one to the full amount awarded by the jury. It suffers from its mistake in calling the remittitur a j.n.o.v.

¶62. Where the majority resumes a true course is its analysis of the j.n.o.v. the trial court granted which denied Stewart the entire punitive damages award. The majority finds that this was error and reinstates the jury's verdict. I disagree with the majority that Stewart put on sufficient evidence in support of the punitive damages award so I must dissent as to this issue as well.

¶63. Our high standard for awarding punitive damages in a breach of contract action is worth repeating:

> Although punitive damages are not ordinarily recoverable in cases involving breach of contract, they are recoverable where the breach results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort. In these instances, they act to punish, and are to set an example, thereby discouraging others from similar behavior. As such, punitive damages are allowed only with caution and within narrow limits.

*Hurst v. Southwest Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1350 (Miss. 1998). Punitive damages are only to be awarded in extreme cases. *Tideway Oil Programs, Inc. v. Serio*, 431 So. 2d 454, 460 & n.1 (Miss. 1983). They are not favored in the law and are only to be awarded with caution and within narrow limits. *Standard Life Ins. Co. v. Veal*, 354 So. 2d 239, 247 (Miss. 1977). As can be seen from the facts in this case, the trial court took the most cautious and deferential route with regard to punitive damages our rules of civil procedure allow. While the trial court certainly had the power to refuse to submit the question of punitive damages to the jury for its deliberation, it did not. Upon further reflection, the trial court concluded that Gulf Guaranty had an arguable reason for denying coverage which did not rise to the level of an independent tort done intentionally or with gross negligence. I agree with the trial court's assessment and action.

¶64. The majority offers three ways Gulf Guaranty's actions amounted to an intentional tort which constitute three grounds for overturning the trial court's j.n.o.v.: the failure of Gulf Guaranty's agent to go over the

policy provisions-including the preexisting condition clause-with Stewart, Gulf Guaranty's own failure to investigate Stewart's claim, and Gulf Guaranty's post-claim underwriting. I think that none of the three amount to more than mere negligence. I will now address each.

¶65. The facts as they were developed at trial indicate that Carol Stewart was no newcomer to the ways of credit life insurance. Once before, he had obtained credit life insurance in conjunction with a loan from the Community Bank of Mississippi. Later, when he approached Raymond McAlpin in March of 1996, he specifically requested credit life insurance in conjunction with the loan to convert his mobile home. That he demonstrated a working knowledge about how credit life insurance worked could certainly cause anyone sitting opposite Stewart to believe that a review as to what exactly was required for the credit life insurance to provide coverage was unnecessary. At the most, it was mere negligence, not gross negligence. This ground for reversing the j.n.o.v. is therefore inappropriate.

¶66. The second ground the majority cites for reversing the j.n.o.v. is Gulf Guaranty's failure to conduct an adequate investigation of Stewart's claim for benefits. The majority disregards the fact that on the reverse side of Stewart's claim form, his own doctor indicated that his arthritic condition had existed for several years prior to the submission of the claim. This fact goes to the heart of Stewart's claim and the award of punitive damages which the trial court set aside. What further investigation into this claim would the majority have Gulf Guaranty conduct? Surely any further inquiry into Stewart's arthritic condition would have only supported his own doctor's claim that the condition had existed at least five years before the policy was issued. Should we punish insurers for relying upon the assessment of the injury submitted by the injured insured's own doctor? Being a pre-existing condition and therefore excluded from coverage, Stewart's claim needed no further investigation. This ground for reversing the j.n.o.v. is insufficient.

¶67. The third ground for reversing the j.n.o.v. the majority offers is its assertion that Gulf Guaranty engaged in post-claim underwriting. The majority ignores the fact that Ellen Methvin, the person handling claims for Gulf Guaranty, testified at trial that Stewart was insured, and had he died or developed cancer his claim would have been covered by the credit life insurance policy issued to him. The majority also overstates when it says that Methvin stated in her deposition that Stewart was uninsurable. She only stated that his arthritic condition and therefore his permanent disability would not have been covered by the policy had she known of the condition at the time of the policy's issuance. Gulf Guaranty's offer to rescind the policy is just that, an offer. It states the common sense notion that since Stewart's arthritic condition was not covered by the policy, he might wish to discontinue the coverage entirely. However, there are just as many reasons to continue the coverage as there are to rescind it. Gulf Guaranty's actions are entirely consistent with its determination that the preexisting arthritic condition was not covered under the credit life policy.

¶68. The trial judge saw the theme in our law that preexisting conditions are arguable grounds for denying coverage to an insured as well as a reason for withholding the question of punitive damages from the jury. Where punitive damages are awarded in spite of the determination that there was an arguable ground to deny coverage, the standard of proof required to justify the award must be very compelling. Despite what the majority identifies as compelling reasons the punitive damage award should be reinstated over the trial judge's j.n.o.v. order, I find Stewart's preexisting arthritic condition sufficiently answers the second and third grounds for reinstatement. The first ground is counteracted by Stewart's own knowledge about credit life insurance and the high standard of proof required to award punitive damages. Stewart, by supplying grounds for punitive damages, has not demonstrated adequately in light of our standard of review why those damages were appropriate under the circumstances of this case. The trial court took the best route when

considering these damages. I therefore must dissent to the action the majority now takes.

¶69. In summary, I would reverse the final order as it does not reach a final judgment as to the emotional distress damages. Since it is apparent to me that Stewart contests the remittitur, the case should be remanded for a new trial for emotional distress damages only. As to punitive damages, I think the trial judge had sufficient grounds to grant a j.n.o.v. in favor of Gulf Guaranty. I would affirm this portion of the final judgment.

## WALLER AND COBB, JJ., JOIN THIS OPINION.

1. The percentage of premiums received by Community Bank as commission, though it was the maximum rate allowable, did not exceed the limitation imposed by statute. *See* Miss. Code Ann. § 83-53-25 (1999) (stating that 45% is the maximum rate of compensation allowable).

2. Miss. Code Ann. § 83-53-13 (1999) states that credit life and disability insurance shall be evidenced, in the case of group insurance, by a certificate of insurance, which shall be delivered to the debtor.

3. There is nothing illegal, per se, about the fact that the policy contained an exclusion for preexisting conditions. Miss. Code Ann. § 83-53-23 (1999) allows exclusions in credit insurance policies for intentional self-inflicted injury, pregnancy, foreign residence, flights in nonscheduled aircraft and preexisting conditions.

4. *See* Miss. Code Ann. § 83-9-3 (1999).

5. Miss. Code Ann. § 83-53-15 (1999) requires that all policies, certificates of insurance, and applications for insurance be filed with the Department of Insurance for approval prior to use.

6. In addition to complaining that he did not receive a certificate of insurance, Stewart complains that he was not given a copy of the master group policy. Miss. Code Ann. § 83-53-13(1) requires only that the certificate be delivered to the debtor. Though Stewart makes much ado of the fact that he did not receive a copy of the master policy and that the master policy was somewhat of a "secret policy" between Community Bank and Gulf Guaranty, the record and case law indicate that this is a procedure commonly used. **Gulf Guar. Life Ins. Co. v. Kelley**, 389 So. 2d 920, 922 (Miss. 1980). In such cases, the insured is given a certificate referring him to the master policy for terms and conditions of the insurance contract. **Id.** The insured has the right to examine the master policy if he should so desire. **Id.**

7. Note that the wording of the second option that this Court announced in **Odom**, that the plaintiff can appeal the remittitur order, is misleading as the plaintiff would actually be appealing the order for a new trial after the plaintiff's election to reject the remittitur. *Cf.* **Thomas v. Fleming**, 241 Mis s. 26, 32, 128 So. 2d 854 (1961) ("Plaintiff had three choices when the court announced its decision to order a new trial on damages unless a remittitur was accepted: He could refuse to accept, and try the case again on damages; *he could elect to appeal from the order granting a new trial . . .*; or he could accept the remittitur.") (emphasis added). This option is no longer available as the statute upon which this option relied was repealed as of 1991. *See* Miss. Code Ann. § 11-7-213 (Supp. 2001). A plaintiff must either reject the remittitur and have a new trial on damages or accept the remittitur. *See* **Commercial Credit Co. v. Spence**, 185 Miss. 293, 184 So. 439, 492 (1938).

8. At this time, Miss. Code Ann. § 11-7-213 was still in effect.

9. The author of the Court's opinion in ***Investors Property*** would later clarify his position in ***Investors Property*** in ***Goodwin v. Derryberry Co.***, 553 So. 2d 40, 45 (Miss. 1989)(Robertson, J., concurring in part and dissenting in part).